510 P.2d 388

**Elmer L. ROWE, Petitioner,**

v.

**The INDUSTRIAL COMMISSION of Arizona, Respondent,**

**Motorola, Inc., Respondent Employer, Motorola, Inc., Respondent Carrier.**

**No. 1 CA–IC 772.**

Court of Appeals of Arizona, Division 1, Department A. June 5, 1973.

**78**

———◆———

Chris T. Johnson, Phoenix, for petitioner.

William C. Wahl, Jr., Chief Counsel, The Industrial Commission of Ariz., Phoenix, for respondent.

Evans, Kitchel & Jenckes, P. C., by Stephen W. Pogson, Phoenix, for respondent Employer-respondent Carrier.

STEVENS, Judge.

The Industrial Commission of Arizona entered its award in the above matter on 7 February 1972. The petitioner, Elmer L. Rowe, who is the injured employee, filed a timely petition for a writ of certiorari to review the lawfulness of the award. Motorola, Inc., a self-insured employer, likewise addressed a petition for a writ of certiorari to the same award. The two petitions were consolidated in this single

cause and have been processed under the above caption.

The industrial injury here in question was sustained on 3 October 1969. On that date the petitioner received an acid burn on his right forearm and he also inhaled some acid fumes. The acid fumes brought about a sinusitis problem for which the petitioner was treated by Neil O. Ward, M. D., from 20 October 1969 until he was discharged from that treatment on 27 February 1970. The matter of the sinusitis problem has been withdrawn and is not of concern in this opinion. The acid burn on the forearm is the basis for our current concern. The acid burn led to an ulcer on the forearm.

On 5 November 1968, while working for a different employer, insured by the State Compensation Fund, the petitioner sustained a back injury. That claim was still open and the petitioner was still receiving compensation in relation thereto when he secured his employment with Motorola.[1]

On 20 May 1971 Motorola issued its notice of claim status based upon a 25 March 1971 medical report submitted by Jerry W. Bains, M.D. The notice of claim status terminated the temporary compensation for the acid burn as of 14 May 1971 and terminated his medical benefits for the acid burn as of 25 March 1971. This notice of claim status laid the groundwork for the hearing and the award now in question.

The award of The Industrial Commission approved the award of the hearing officer which suspended the petitioner's compensation from 3 June 1971 through 24 September 1971. 24 September 1971 was the date of the second installment of the hearing arising out of Motorola's notice of claim status of 20 May 1971. The petitioner urges that there should have been no suspension or, at the most, that the suspen-

---

1. The petitioner's average monthly wage at the time of his November 1968 back injury was higher than the average monthly wage paid to him by Motorola. The two carriers entered into an agreement as to the share of the petitioner's tem-

porary compensation which each would pay. No issue is presented as to this agreement as it did not affect the petitioner's overall temporary compensation payments.

sion should not have been for a greater period than 3 June 1971 to 25 June 1971. The petitioner also urges that the suspension of compensation did not authorize Motorola to suspend the payment of medical benefits. On the other hand, Motorola urges that both compensation and medical benefits should have been suspended as of 25 March 1971 and that neither should have been restored.

The basis of the suspension of compensation is found in A.R.S. § 23–1026, subsec. E which reads:

"E. Upon appropriate application and hearing, the commission may reduce or suspend the compensation of an employee who persists in unsanitary or injurious practices tending to imperil or retard his recovery, or who refuses to submit to medical or surgical treatment reasonably necessary to promote his recovery."

and in A.R.S. § 23–1027 which reads:

"No compensation shall be payable for the death or disability of an employee if his death is caused by, or insofar as his disability may be aggravated, caused or continued by an unreasonable refusal or neglect to submit to or follow any competent and reasonable surgical treatment or medical aid."

The hearing officer's award, which was approved by The Industrial Commission award of 7 February 1972, includes the following findings:

"18. In the instant case, the preponderance of the evidence is that the applicant's continuing medical difficulties were the result of his own unsanitary or injurious practices and/or his unreasonable refusal or neglect to follow reasonable medical advice.

\* \* \* \* \* \*

"26. The reasons for the applicant's continuing medical difficulties are his injurious practices and/or his unreasonable refusal or neglect to follow competent medical treatment. A.R.S. §§ 26–1026E, 1027.

"27. The applicant has failed to sustain his burden of proof that his continuing difficulties were not due to his own injurious practices and/or his negligence or refusal to follow the advice of his doctors without reasonable grounds for such refusal."

It is noted that the hearing officer did not expressly find that the petitioner's "unsanitary practices", or that the petitioner's "injurious practices", or that an "unreasonable refusal" by the petitioner "to follow reasonable medical advice", or that an "unreasonable * * * neglect to follow reasonable medical advice" in relation to any medical care or ulcer problem was the basis for the suspension. The hearing officer, without specification, combined the several grounds for suspension found in A.R.S. § 23–1026, subsec. E and § 23–1027. The hearing officer did not pinpoint any one or more of these alternatives as to the time or to the cause of the petitioner's slow recovery.

In Hamlin v. Industrial Commission, 77 Ariz. 100, 267 P.2d 736 (1954), the Arizona Supreme Court stated that:

"In making this decision [to suspend benefits] the Commission cannot act without sufficient facts to warrant its conclusion." 77 Ariz. at 104, 267 P.2d at 739.

In the Hamlin case the Supreme Court reviewed the medical evidence and concluded that Hamlin was not unreasonable in his refusal to submit to further back surgery. The Supreme Court further stated that:

"Each case must be determined upon the particular facts." 77 Ariz. at 105, 267 P.2d at 739.

Thus, it becomes necessary to review the extensive problems which were experienced by the petitioner.

Immediately following the 3 October 1969 acid burn the petitioner was referred by Motorola to F. R. Rabe, M.D. Dr. Rabe sent the petitioner to Carl Yarbrough, M. D., a dermatologist. Dr. Yarbrough treated the petitioner from 13 November 1969 to

5 January 1970. Dr. Yarbrough's experience was not dissimilar to that of later physicians in that the ulcer resulting from the burn would improve and then retrogress.

The doctor prescribed a Lassar's paste which the petitioner found to be very irritating to the skin. Petitioner understood his instructions to be to remove the paste with oil before reporting to the doctor's office for follow-up visits. The doctor testified that he instructed the petitioner to not wrap the wound. The petitioner did wrap the wound. Petitioner testified that the doctor's nurse advised that he might so do if the pain became too severe. After the ulcer appeared to be well on the way to healing it broke down. Dr. Yarbrough then hospitalized the petitioner to apply the same treatment under hospital supervision. The petitioner could not stand the hospital confinement and when released from the hospital the ulcer again appeared to be well on the way to healing. After the petitioner's release from the hospital the ulcer again broke down. The doctor expressed the opinion that the wrapping of the wound aggravated the ulcerous condition.

The doctor testified that *part* of the petitioner's problem was his failure to follow directions. He expressed the opinion that the petitioner did not intentionally, maliciously, or with purposeful intent aggravate the site of the injury. The doctor concluded his testimony stating:

> "I just don't think I was helping him any, and I didn't think that I could get with him enough that I was going to help him."

Thereafter Dr. Rabe referred the petitioner to Eugene Leibsohn, M. D., a dermatologist. Under Dr. Leibsohn's care the ulcer would give the appearance of being substantially healed and would then break down. At times the pain was so great the petitioner called the doctor at night. The doctor testified that he questioned the petitioner closely about any activity which would aggravate the condition and that he was satisfied that the petitioner was following the doctor's instructions. The doctor could give no medical reason for the failure of the ulcer to ultimately heal.[2]

In December 1970 Dr. Leibsohn felt that possibly plastic surgery would be the answer and the petitioner was sent to Dr. Bains.

After certain preliminary surgical procedures, Dr. Bains performed a skin graft on 7 January 1971. During the healing process the petitioner was sent to Charles L. Echols, Jr., M. D., a neurologist. During one of Dr. Echols' examinations he noted a marked change for the worse in the appearance of the skin graft. On 25 March 1971 Dr. Bains wrote a report which was the basis of the 20 May 1971 notice of claim status. The report expressed the opinion that the retrogression in ulcerous condition was a factitial wound, that is, self-inflicted and other than natural. This the petitioner denied. The doctor suggested that any further treatment not be an industrial responsibility. The doctor nevertheless performed another skin graft on 26 April.

Dr. Bains testified:

"A I thought the wound was factitial, self-imposed. I confronted Mr. Rowe with this and he denied it. I stated so in my records and I still have that opinion.

"Q Was there anything that Mr. Rowe told you that gave you that opinion or was that just from your examination?

"A It was from several things throughout the case history. There is no proof, he did not state anything in the history, no, sir.

\*　　\*　　\*　　\*　　\*　　\*

"Mr. Rowe was operated on on 10–20–70, and the protrusion of the disc material at lumbosacral interspace found. He has had a discectomy at this level."

2. On 13 October 1970 the petitioner, while being treated for the ulcer, was hospitalized in relation to his November 1968 back injury. We quote from the report of Howard M. Johnson, M.D.:

"Q Did you say the original graft at one point was completely healed?

"A There were two areas of about two millimeters in diameter which mysteriously would not heal, but to all intents and purposes he had a healed wound for six weeks, from the time of the grafting until this mysterious disease appeared in the center of the graft.

"Q Do you have any explanation for the recurrence of these new disease areas?

"A I have an opinion but no explanation.

"Q By way of hypothesis would such a recurrence of the diseased or ulcerated area result from severe scratching?

"A No, this does not appear to be that type wound. This was a blistering which progressed through the same type wound when I first saw him, the same appearance of the skin, a white thick tan color.

"Q This was on the surface of the grafted area?

"A This was in the center of the grafted area with some surrounding normal skin, uninvolved skin.

"Q It was on the basis of that alone that you felt that this had been a factitial situation or were there other factors?

"A Taking this into consideration of what we discussed at length of 18 months down from the time of the burn until the declaration of the third degree loss at the location of the new area which was in the center of the graft, the appearance of it appeared to be the same as I saw him for originally, all of which to me added up to this and again this is no proof, there is no way you can prove this sort of thing but that is my opinion. I realize I am sticking my neck out but on the other hand I have treated patients many times for factitial wounds and I suppose being sensitized to the problem makes it easy to arrive at a conclusion."

On 3 June Dr. Bains suggested that the petitioner see another doctor. Dr. Bains recognized that the petitioner was then in need of further medical care.

The petitioner returned to Dr. Leibsohn begging for help. Dr. Leibsohn testified that at that time the petitioner's condition was such that something had to be done.

On 25 June 1971 the petitioner first saw Eugene Migray, M. D., a plastic surgeon. Dr. Migray performed a Pedicle flap on 26 July 1971. In the process the forearm is bound to the abdominal wall for about four weeks. Although there were some unpleasant problems in relation to the graft, the graft appeared to be substantially successful with a supplemental pinch graft which was performed on 15 September 1971. The petitioner appeared to be making good progress at the time the doctor testified on 24 September 1971. [This is the date the hearing officer selected for the termination of the suspension of compensation.] The doctor testified that while it is rare, skin grafts do break down. He further testified:

"A. Yes, but it proves also he has a very bad blood supply and bad tendency for healing."

In the area of the matter of the petitioner's cooperation, Dr. Migray testified:

"Q. Doctor, did you ever have the feeling that Mr. Rowe was not following your orders in the care of his arm?

"A. He didn't really not follow the orders, but he is the type of person that is difficult to treat. He asks for more pain medication. He adjusts bandage and so on, but in general he followed my advice.

"Q. You say he adjusted his bandage. Were there occasions when you noted that the bandage had been adjusted between the time that you changed the bandages?

"A. Yes, but he said it was necessary, that it was falling off. It was not without reason."

We quote portions of the petitioner's testimony:

"* * * When I went to the doctor and stuff, he asked me why I did it. I told him because I couldn't stand the stuff. He says, 'If you can't stand it all the time, try to do it, you know, part time. Leave it unwrapped then if it gets to hurting so bad.' He said to go ahead and wrap it.

\* \* \* \* \* \*

"Q. You have heard some testimony by Dr. Yarbrough and Dr. Bains that they didn't feel that you were cooperating one hundred percent. What is your feeling on that?

"A. I did everything I could. I did everything I could. If I had to change anything that they told me to do, I called the office and asked the office first. I was going to get shots and everything else all the time at the hospital, the emergency room and everything else for this pain.

\* \* \* \* \* \*

"Q. Mr. Rowe, did you ever intentionally do anything to aggravate the condition of your arm?

"A. No, sir.

"Q. Did you ever unintentionally do anything, as far as you know, to aggravate your arm condition?

"A. No, sir.

"Q. Have you ever unintentionally bumped your arm against anything that seemed to make it flare-up?

"A. Not unless I did it in my sleep.

\* \* \* \* \* \*

"A. * * * The only thing I have got to say as to what Dr. Migray said, which I have known it for quite a few years. The type of blood I have and stuff, which I forget the type it is, I do not heal very well. If I cut a finger or something, it takes as long as three to six months to heal a little cut. I have had this on my arm right there now for almost seven months. Why isn't it healed? This is my only answer. I don't know."

From an overall review of the record, we find that the petitioner was a man with a very severe ulcer problem which was exceedingly painful. He had been told that he might sustain the loss of his arm if the ulcer was not cured. He was not the easiest patient to care for, and not all patients are. The exact period of the duration of the compensation arising out of the November 1968 back injury is not established in the record. The record clearly establishes that the petitioner did not purposely fail to follow the details of the advice of his doctors. It appears that the petitioner was not dependent upon temporary compensation related to the ulcer. He was 28 years of age at the time of the acid burn. There is no proof of self-inflicted aggravation of the ulcer. The continuation of the ulcer, the response to medical care and the recurring breakdowns at a time when healing appeared to be imminent defied the minds of several qualified specialists. Dr. Bains called it "mysterious".

We hold that the suspension of compensation was not reasonably supported by the medical evidence and that this case falls within the principles of Hamlin, supra. We need not answer the question as to whether the suspension of compensation prior to the closing of an industrial claim carries with it the suspension of medical, surgical and hospital benefits as defined by A.R.S. § 23–1062. The cases of Pressley v. Industrial Commission, 73 Ariz. 22, 236 P.2d 1011 (1951) and Stout v. Industrial Commission of Arizona, 12 Ariz.App. 211, 469 P.2d 103 (1970), are of interest but do not answer this particular question.

The award is set aside.

DONOFRIO, P. J., and OGG, J., concur.